Good morning, Your Honors. My name is Daniel Greenfield, and I represent Plaintiff Appellant Joseph Mizzoni. I'd like to reserve four minutes for rebuttal. May it please the Court. Humans are a social species, hard-wired to connect to one another. Thus, we not only crave but require social interaction and environmental stimulation. It is no surprise, then, that solitary confinement, which is the near-total isolation of one human from another in a bleak and monotonous environment, often inflicts severe psychological and physical injury on even the healthiest of humans. And it is well known that 23- or 24-hour-a-day isolation is especially dangerous for those humans who, like Mr. Mizzoni, suffer from mental illness. After Defendant Smith wrote a false misconduct— Wait, can I just interrupt you for a second? Yes, Your Honor. Because you're making very compelling arguments about solitary confinement, but I really struggled, in this case, to find in the record where there is anything that describes his confinement as being solitary. So, is there anything that says he doesn't have a cellmate or can't talk to the inmates around him? I couldn't find anything like that. Your Honor, Mr. Mizzoni described being locked away in his cell for 23 or 24 hours a day, and he described the different components of crushing social isolation that comprises solitary confinement. So, can you point me, in the record, to where the isolation is described? I think, at summary judgment, we can infer from Mr. Mizzoni's statement that he was locked in his cell for 23 or 24 hours a day and was denied all congregate activity. So, if he had a cellmate, would these concerns you have about isolation still exist? Well, to be clear, there's no evidence in the record that he had a cellmate. And I don't think that he did have a cellmate, and defendants have not suggested that he did. But the scientific evidence, which is also that solitary confinement with another cellmate is still as physically and psychologically harmful, but defendants have not suggested that he had a cellmate. He said he was... But I don't think he suggested that he didn't have a cellmate. So, I'm just trying to understand. It felt to me, when I was looking at this evidence, it didn't match this case. Like, you were representing a client who was a different client or something. I was just really having trouble. Yeah, I understand that, Your Honor. And I think that Mr. Mizzoni, who suffers from severe mental illness, which defendants do not dispute, is an unskilled litigant. And I think that it requires careful review of a sometimes difficult-to-follow record. But if you take each component of what he described, which is he was denied congregate activity on the tier, meaning that he could not spend time with other human beings, that he was denied the touch of visitors, that he was limited in his ability to communicate with the outside world, what he is describing is solitary confinement. And in fact, in the Nevada Department of Corrections, disciplinary segregation is the most restrictive form of restrictive housing. There is no higher level of solitary confinement, as far as I am aware, within the Nevada Department of Corrections. And defendants have not suggested that he was not in solitary confinement. And I think, in light of his status as a severely mentally ill pro se prisoner, the appropriate inference in summary judgment, in light of the fact that he did not move for summary judgment, is that he was, in fact, in traditional solitary confinement. But the magistrate judge didn't seem to think so. And I'm just not sure how we can point to something that shows that the magistrate judge was clearly erroneous. I mean, it's summary judgment, so I guess it's a no-go. But the magistrate judge looked at the record and described it, and I'm not sure how we can explain what the magistrate judge did wrong. So I think the magistrate judge made three fundamental errors, which I'd like to take you through. It's true that if you read the magistrate judge's order, you would have no idea that the case was about a mentally ill prisoner locked inside an eight-by-ten cell for 23 hours a day. Instead, the district court analyzed restrictions, many of which appear trivial in isolation. But when you view them in the aggregate, Mr. Mazzoni's evidence is that he endured a life wholly cut off from humanity. Specifically, he did not have freedom to engage in congregate worship. He did not have freedom to engage in what he called tear time. But what that means is he was confined to his cell when in general population he had what he described night and day freedom to enjoy social interaction with other human beings. He did not have the opportunity to feel the touch of a visitor. And all of that is in the record, and I think that the district court just missed it. Rather, the district court viewed this as a case about trivial deprivation, such as, like, what color jumpsuit did he wear? Did he have access to a cafe that he did when he was in general population? But you take all of the things together, plus his mental illness, plus his statement that this was a night and day difference from general population where he essentially had great liberty to interact with other human beings. This is solitary confinement, although the Nevada Department of Corrections calls it a disciplinary segregation unit. I'm not aware of any unit in the country that refers to solitary confinement as solitary confinement as Justice Kennedy and Justice Sotomayor have stated. Administrative segregation, disciplinary segregation, intensive management union, those are just euphemisms for being isolated from other human beings 20 or three or 24 hours a day. And I think if you look at Mr. Mazzoni's perjury, his swarm summary judgment briefing, also under penalty of perjury, he is telling a story of being a mentally ill prisoner cut off from humanity for 23 or 24 hours a day. And I think the second error that the district court made was that it construed the Sandin analysis as a rigid balancing test solely comprised of three factors, each which must be weighted equally. In other words, it was a math problem for the district court. In reality, one of the prongs could overcome the other. So it doesn't mean that a prisoner in solitary confinement gets, is entitled to a modicum of procedural protection only if two of the three identified factors are in his or her favor. Rather, you're taking a holistic view of what the hardship here. And the district court, just for one example, did not consider the fact that Mr. Mazzoni was mentally ill. And this court has held in Serrano v. Francis that that is an important part of the analysis. You take the hardship as it applies to a particular prisoner. It's not a one-size-fits-all analysis. Suppose, I'm having some trouble with this. I remember 100 years ago taking a peniology course where in the early days, it was a favored thing to be alone so that you can meditate upon the ills that you've done and correct yourself. And they'd have these yards. They don't do that anymore. But there is a need, apparently, for some prisoners to be apart from the other prisoners. Now, you're not saying that under no circumstance can you have solitary confinement. You're not taking that role, are you? Your Honor, I'm not. And I concede that there are circumstances under which short-term solitary confinement might be necessary. Well, you said short-term. It could even be long-term. If a person was really a danger to other prisoners and was stabbing them or whatever, there may be reasons. But what you're saying is there should be reasons. You're right. That's exactly right, Your Honor. I concede that in certain circumstances, long-term solitary confinement could be appropriate. I believe that a series of former correctional directors in their amicus brief before this Court in this case said that solitary confinement of a long duration is rarely called for. And there are other means of... So it's not just solitary confinement. It's how long it is. Correct. So how long it is depends upon the person and the events that are involved. And in this case, they convicted him, he disagrees, that he struck a correctional officer. And he was receiving this because of that. And tell me why, aside from the length of the time, tell me why you think a correctional officer would be inappropriate. Your Honor, I want to make an initial point clear here. It may be that Mr. Mazzoni should have been in solitary confinement. It may be that he did strike the correctional officer. The question is, was he entitled to procedural protections to prove that he did not deserve that severe and dangerous punishment. The District Court said that he was not entitled to any procedural guardrails. That is, he was owed no more process than if the prison officials decided to switch from a bag lunch to a tray lunch. All we are saying here is that Mr. Mazzoni was entitled to the fundamental contours of due process so that he could prove that he did not belong in solitary confinement. There's a long history behind this. We went forever trying to get the prisons to give them any rights at all. And they finally gave in. We got agreements with the states that they would do something. So this isn't like being in a district court and you've got a city jail. This is on a different context. What specifically? They had a so-called trial. They decided that he was not telling the truth. What more at that level should they have done? Understand it's in a prison, not in a city jail. You're correct, Your Honor. So can I just say as a predicate matter, I don't think this court should reach the question of the process that he received. The District Court did not reach the question of the process. I don't know why we would remand if there's just no way that he has a claim on due process. That makes sense, Your Honor. And let me explain why I think that this was a sham process that does not satisfy the standards of either Wolf or Hill. Mr. Mazzoni's summary judgment evidence is that the evidence used to convict him was fabricated and that the bulk of exculpatory evidence was denied him in two steps. First, he requested a videotape or a series of videotapes which he swore would be exculpatory. That was denied to him. But is there really evidence that, I mean, what is his basis for thinking that the videos that existed were exculpatory? It seemed like maybe the videos would show who witnesses were. So, Your Honor, I think he was somewhat unclear below, and I think at various points he made both statements. It's certain that the video would have permitted Defendant Brannon to identify the witnesses Mr. Mazzoni wanted to call. At other points, Mr. Mazzoni says, no, the videos went beyond that because officers wear body cameras. And so they would have shown that it was, in fact, Defendant Smith who assaulted Mr. Mazzoni and that Mr. Mazzoni did not assault him. So beyond the videotape, which I think it's important to recognize that the district court said that a spoliation instruction would be appropriate. Beyond the videotape, Mr. Mazzoni's name was also tied behind his back because he could not call any exculpatory witnesses. The only witness he was permitted was his cellmate. His cellmate did not see anything relevant. But so is there a due process obligation on the defendant's part to help him identify witnesses? There was an obligation on defendant's part not to deny him a videotape unless it interfered with security. And even if they wouldn't let him view the videotape, defendants have not So do they have to preserve a video? I mean, they say the video doesn't show the incident. So maybe there's part of the claim that disputes that. But let's just say for now it's video of witnesses, but not of the actual altercation. Is it your position that due process requires them to preserve that video? It would be my position that in order to have a fair hearing that complies with Wolf and that complies with Hill, they must endeavor to offer him a fair hearing. And that would have included at least Defendant Brannon reviewing that videotape and identifying the defendants. Nothing would have been Wait, identifying the defendants? I thought it was I'm sorry, identify the witnesses. Nothing would have been hurt here by Defendant Brannon pushing off the disciplinary hearing for a few days or even a few hours so he could review the videotape and allow Mr. Mazzoni to marshal some defense. But so you do think it's a due process obligation to help him find the witnesses? I think it is a due process obligation to provide a fair hearing. And what that means in each particular case is a question that can be answered in each individual case. In this case And the suit here is a suit for monetary damages against officers, right? So they're going to have qualified immunity. So you'd have to show that this due process obligation is clearly established. I think it is beyond established. And I see that I'm well into my rebuttal time. I think it is I'll still give you rebuttal time. Thank you. I think it is beyond established that defendants cannot hold a sham hearing and tie a prisoner's hands behind their back, prevent them from marshaling a bona fide defense even under the minimally stringent standard of set forth by Hill. It just seems like what you're calling preventing them is failure to assist him. I mean, if he knew who the witnesses were, we have no evidence that if he's, I mean, he did have one witness, right? So if he'd said, I know these other three people saw it, I'd like to call them. We have no reason to think they were going to stop him from doing that. Well, we just don't know based on this record. But what we do know is that the one witness he was permitted to call didn't see it. And so solitary confinement is an incredibly dangerous penalty to impose on someone for a year and a half to two years. I'm not sure the due process doesn't require Mr. Mazzoni a bona fide opportunity to marshal a defense so that he would not be subjected to that crushing isolation. You think there's a sliding scale based on the punishment. If he was only going to be losing some good time, maybe it's okay. But if he's going to be sent to solitary confinement, there's a heightened requirement here. It was a rhetorical question. Yeah. I think the best way to answer that is that when a prisoner is going to lose something serious, where there are going to be sanctions with crushing restrictions, that they are owed under Wolfie McDonnell and Hill an opportunity to put forth some evidence in their favor. Thank you. I'll still give you two minutes for rebuttal. Good morning. My name is Randall Gilmer. I'm from the Office of the Attorney General for the State of Nevada, and I'm here to represent the appellees in this matter today. And I would like to point out that I think this goes to the heart of some of the questions that the panel asked my colleague, and that there has been no evidence of any error that occurred here either by the magistrate judge who issued a 15-page report and recommendation or the district court judge who then not only, for lack of a better term, didn't just rubber stamp it with a one-sentence adopt, also provided their own analysis of five pages with regard to why there was no liberty interest in this case. So I'd like to first point out that we fully agree that the district court and magistrate judge made the correct determination that there's no liberty interest owed in this case. In addition, alternatively, and the district court's report and recommendation indicated that they did not need to reach that question because of the finding of no liberty interest. However, based upon the facts before this court, as Judge Freeland noted, while there's some disputes with regard to the excessive force claim, that was a different issue, and there's some disputed facts as to who struck first or so on and so forth, there is no disputed facts as to what type of hearing he was provided in that respect. So I think alternatively, we do win on that ground, even if this court were to find it. So can you clarify? I do think there's something in the record that suggests that the officers would have been wearing body cameras, or the guards would have been wearing body cameras, and yet it seems like there aren't videos of the incident. So maybe he does have a claim that videos of the incident were destroyed? Can you explain this? Thank you, Your Honor. I believe that there's something in the record that the cert officers, which would be the escort officers that would have come to the scene as a result of the call for help, because after the initial altercation had occurred, would have had on body cameras. So assuming they had those body cameras and came, it would be the cert officers that would have shown up after the initial assault, not any of them that would have been on the scene during the assault. And those body cameras generally, and there is a retention schedule, they're maintained and kept. Those would not be turned over generally, because a search and rescue would be a safety and security concern issue with regard to that. But back to the question, though, let's assume they existed and assume that we had record and because, again, it would have been the cert officers that would have shown up after the initial altercation, whether or not the witnesses or other inmates that may have been seen on those videos would have actually seen the altercation is speculation. And as you pointed out, Your Honor, we do know that Mr. Mazzoni asked for one witness by name. That witness was provided, and that witness actually does back up Mr. Mazzoni's story in this regard. He says that he saw Officer Smith take Mr. Mazzoni down to the ground and yell, stop resisting. It certainly implies that the cellmate didn't believe that there was a reason to take him down to the ground, that he had witnessed anything that would have justified Smith's actions, so to speak. And again, the excessive force component is not part of this case. I think that's important to remember. But even though he didn't know the names of other inmates, the one witness that he did ask for, he was obtained, and that witness does support his story in that respect. But you're saying as to the videos, that most of the videos would have shown is who the witnesses were. They wouldn't have shown the incident. That's my understanding, Your Honor. To the extent that body cams would have been worn, those would have been worn by cert officers that would have come to the scene after the incident occurred. Now, to the extent that there may have been video of the unit where this occurred, that may have shown some of the incident. And again, at the summary judgment record, we have to assume that that's the case, and may have shown some witnesses that saw it. But again, that takes us to what process is owed. And I think, Judge Freeland, you raised a very good point. How much do we have to give them? But if there was a video of the incident that you destroyed, that seems like it is really concerning. And it sounds like maybe you are saying that that might have existed now. Well, I'm not, I didn't, I do not know if a video existed. We've maintained that throughout. If the video was destroyed, assuming that one existed, it would have been destroyed pursuant to the normal retention schedules, not superdiciously. And it would have also, it's also we need to remember as well that neither of these two defendants, Brandon or The magistrate judge did give the spoliation instruction, had this gone to the jury. But I think the district court pointed out correctly that to the extent it existed, it has no legal bearing with regard to the due process components here. It may have certainly put my client in a bad situation, and my client meaning the Department of Corrections, in which they were imputing that information to Brandon or Smith. But there's no evidence that Brandon or Smith or even the Department of Corrections did anything intentionally or purposely to destroy any video that may or may not have existed. Again... As to the conditions of confinement, the opening brief describes this as solitary confinement. And I didn't really see that your brief said they're wrong. So are they wrong or are they right? Thank you, Your Honor. We stand by it being disciplinary segregation. Nevada does have one harsher sentence than disciplinary segregation. It's called disciplinary detention. It's seldom if ever used. However, I did want to point that out. Generally speaking, disciplinary segregation inmates do not have another cellmate. However, they are able to communicate with other... Again, none of this is in the record, but they can communicate with other witnesses or other individuals on the unit. They're not like there's soundproof walls or anything like that. So they do have some ability to communicate with other inmates. Can they see other people? Is it like a hallway and they can see across or is it... I do not know the answer to that, Your Honor. I apologize. I've been there before, but I get my units mixed up. It's certainly possible that they may have been able to see each other depending at the time and at the place where they were located. It's also possible that they may not have been able to see each other. But there are... It's not like a complete door. The door has a window. You can see out the window. You can see other people. And he also... He wouldn't be able to see other people if there's not a cell across, right? Correct. Correct. There would always be a cell across, but whether or not somebody was in that cell or not would be a question. The units have, you know... So that is certainly possible that you may not be able to see other people depending on where the location of your cell is, at least into another cell. However, if that person was being escorted somewhere else, you could certainly maybe see that if you're at the window. I have a question I want to ask you about what we're doing here. This whole process of even getting inside the prisons was done by statute and negotiation. And it isn't like what happens in a city jail where we get in and we find out what's going on. And we entered into that arrangement. The state did. And some of the process depends upon where we're sitting. If there's a liberty interest, it's different from no liberty interest. You've taken the position that there's no liberty interest. Why is that? Why didn't he have a liberty interest for this kind of a punishment of 18 months in solitary confinement? Even assuming he hit the guard and assuming that they gave him the 18 months, why isn't there a liberty interest? Thank you, Judge Wallace. I think in that respect, I think Judge Cobb and the... Magistrate Judge Cobb in the report and recommendation does a very good job of pointing out why this doesn't reach the level of an atypical and significant hardship when comparing it to the general conditions of prison life. But wasn't the judge assuming that it wasn't solitary, essentially? I mean, you're kind of admitting that maybe it was solitary. And that's not really what the magistrate judge assumed. I don't believe that Magistrate Judge Cobb is very familiar with the disciplinary imposes on individuals. And not only from this case, but from numerous other cases. As well as the fact that Mr. Mazzoni had been put in disciplinary segregation a couple years prior to this, that case, there was determination of no liberty interest in that particular case. There, he held 12 months. Is there, in each case, a liberty interest that has to be determined? And if so, on what basis is it determined? The liberty interest, I think I understand your question, Judge Wallace. Please interrupt me if I got it incorrectly. But yes, I believe that the liberty interest has to be determined on a case-by-case analysis. I don't believe there's any, you know, continuation because it's your 10th time now you're entitled to liberty interest. I think it's a case-by-case determination. And when you say the term liberty interest, how is that defined? By what authority is it defined? I think that that is the authority, most on point, is the Sandin v. Conner from the United States Supreme Court, as well as this Court's determination in Chappelle v. Mandeville, which gives us the three factors, which is the conditions that you compare the conditions between another discretionary placement and that placement, the duration, as well as whether or not the placement would inevitably extend the sentence. Now here, Magistrate Judge Cobb determined that the conditions were similar enough that they weren't atypical in a significant hardship, pointing out the different, how many, you can have three showers a day, you're still entitled to one hour a day outside yourself. How is it distinguishable from Brown? Thank you, Your Honor. I believe it is distinguishable from Brown in two, in a couple significant issues. One, Brown was 27 months, and here it was a 20. Okay, so let's say we don't think that's a good argument. What else? Okay, certainly. Brown was also, it said in Brown that it was, that the term could not be changed. There was no periodic review during the process. That is very different here. There is a review. What about the conditions? So what I'm trying to figure out is, were the, it's very unclear what the conditions of confinement were. It sounds like you were agreeing with them that it's maybe more solitary than what the magistrate judge described anyway. So in terms of the conditions of the actual cell and day-to-day life, how is it different from Brown? I'm not trying to dodge your question, Your Honor. I don't think that there's enough in the record for me to feel comfortable to giving you that answer. So let's assume that the conditions here were the same as they were in Brown. I think that Brown is still important to us for a couple of reasons. And assuming the 18-month, that you don't think the duration matters, I do think what's important, and it takes me to the second component of Brown, and even Brown, this Court determined that they were entitled to qualified immunity in that respect with regard to the 27-month timeframe because there had been no baseline. But once Brown has decided, we know that a very long time in solitary confinement is a liberty interest. So why is that not binding here and clearly established? Well, I think that Brown told us that we don't need to determine where the number is. It said under any baseline, 27 months is too long. But I think that — And how do we know that 18 and 27 aren't similar when we're talking about solitary confinement? We don't, Judge. And — But it's — anyway, isn't it a pretty hard argument that the same reason that it's very onerous to be in solitary confinement for 27 months is — doesn't apply to 18 months? Well, but this — it was an unpublished case, Your Honor, but in the previous Mazzoni case, that was 12 months. And this Court said there was no liberty interest, and that was determined after — But we also don't really know what the conditions there were. We have this problem of him not describing the conditions very clearly. Well, and that would be the plaintiff's burden, I would argue, to say what the conditions are, not ours. But — but let's say — but we do know that we had that unpublished opinion from — from Mazzoni, which dealt with the same defendant and the same people. And in that — Different prison, right? Different prison. However, same — the segregation standards at each prison would be the same. The general population would have different — would have different perks, for lack of a better term. But the disciplinary segregation would be the same. I would view this 18 months kind of like, if we can use the Goldilocks analogy, too short, too long, just right. Perhaps this Court thinks 18 months is too long. But I still think that that's not clearly established under what the Supreme Court tells us with regard to qualified immunity. So to the extent that this Court wishes to give a bright-line test and say 18 months is too long or 12 months is too long, whatever that time is, Brown said we're not going to reach that question. We're going to say that 27 months is too long. And that's only part of the analysis in Brown, too, though, because if you do decide that 18 months is more — and for the — and, Your Honor, Magistrate Judge Cobb tended to agree with that respect with regard to that, because Magistrate Judge Cobb actually said that the duration was in favor of Mr. Mazzoni with regard to that. However, again, based upon no case law, and Magistrate Judge Cobb did a very good job in his analysis, I believe it's at 19 of the excerpt of record pointing out that I think that this favors Mr. Mazzoni. However, it's not a bright line. There is no case law that says that, but Brown is 27 months and said 18 months is close enough, so to speak. If our determination is whether or not there's a liberty interest, how would we make that determination based upon this record? I think you — based upon the record, based upon Magistrate Judge Cobb's very thorough 15-page analysis and the fact that Mr. Mazzoni failed to provide evidence of it, I see my time is out. May I finish that answer? Please go ahead. Thank you, Judge. This is important, because it's my question. Thank you, Your Honor. So I think that the record boils that out based upon the report and recommendation, as well as the district court judge, Judge Dew's five-page opinion as well, and just the lack of what Mr. Mazzoni set forth. At the end of the day, it is still his burden to prove his case, and he did not do so here. Yes, but what would you — what would I go to find if I wanted to define liberty interest so I could make that application? Where is the best place for me to read that definition in your regard? I think that Brown is a good place to start with regard to that, Your Honor. And I think Brown does give — does give guideposts in the sense that we know 27 months is too long. But I think it needs to be read in context to the previous Mazzoni case of 12 months saying it wasn't. Saying something is too long is like summing how long is a string. It doesn't help me. It may be one month the liberty interest is violated. It may be six months. It depends on the circumstance. And it's — I'm always uncomfortable if I don't have a structure. So what do you use in your area in review of whether a liberty interest applies? We certainly look at case law and case guidance, and which is why I think that it's important to look at this through Mazzoni — the lens of Mazzoni and Brown and thread the needle through there. We also look at things moving forward, you know, determinations and decisions. And in that respect, I mean, after this, the Department of Corrections now generally has a general policy of 60 days for disciplinary segregation. There are some exceptions. That's a maximum. That's a new rule? Yeah. It went into effect, I believe, in 2017, Your Honor. There is some limitation to that. If it's murder, if it's in — you know, disciplinary murder, it can be a year. Assault on an officer is also longer than the 60-day period. I believe that is six months. So if we looked — if we re-reviewed everything before we decided there was a liberty interest, then we would have to remand to the district court to make a new assessment? Thank you, Judge Wallace. I do not believe you need to do so. And I think Judge Friedland — I apologize — intimated to that as well in response to my colleague's questions. I think the facts before you are clear here. Lieutenant Brannon had all the documentation minus the video. There was photographs that showed injuries to both intentions. There was medical records. No, no. My question was, if we decided there was a liberty interest here, would our role be to remand it to the district court to apply the liberty interest to make a determination? If there was a liberty interest, I believe the facts on this record you can affirm based upon the facts that are in the record, because he was still given a hearing. And I think that the facts with regard to what happened at that hearing are all undisputed. He had a witness who was able to testify, the only witness he was able to identify. And Lieutenant Brannon viewed all of the documents that he had available to him when he made his sum evidence determination. I know I'm running you over, but it's one of the few things a judge can do. I never have a problem with you running me over as long as I'm not the reason for it. In this particular case, this person obviously has medical problems. In his remand for these period of time he is in, was the remand, did the remand include a certain time period in which he would have to receive medical attention to see whether or not his mental problems are being taken care of? I don't believe the record indicates that, Judge, but I can tell you from practice and what I know from the Department of Corrections and how it is done, is there is periodic reviews that are done by caseworkers with that individual. And while they are in disciplinary segregation, they still have full access to all medical and mental health needs that they would need. So the short answer to that is yes, but if you look for it in the record, I don't believe you're going to find it. Thank you. Thank you. So I think we should actually give him four minutes for rebuttal because we took opposing counsel over. I think so. Thank you, Your Honor, for that. Just a couple of brief points. My colleague in briefing, and it seems before the court, has all but conceded that this was solitary confinement, that Mr. Mazzoni might have been able to communicate because the walls were not, quote, soundproofed, suggests that he was subjected to very harsh restrictions. So I think the fact that the magistrate judge did not even reference the phrase solitary confinement suggests that notwithstanding his long experience with these cases, that he may not have appreciated the which my colleague has also conceded is the most restrictive form of solitary confinement that Nevada routinely imposes. I'd like to make clear that district court made a third fundamental error that I was not able to get to before. The first prong of the Sandan analysis asked whether this solitary confinement looks like other discretionary forms of confinement, such as administrative segregation. But I don't think this does, actually, because in administrative segregation, prisoners are entitled to meaningful review under the Supreme Court's rule in Wilkinson v. Austin. So in other words, in administrative segregation, the term of solitary confinement is reviewed perhaps every 30 days to determine whether necessity remains. If we agree with you that there's a liberty interest at stake here and the magistrate judge was wrong and remand, what's going to happen next? How is this due process claim going to be proven up? I think that Mr. Mazzoni would have an opportunity, and both parties below would have an opportunity to brief. Let me back up. It could be handled a couple different ways. First, it could go to trial, and each side could put on witnesses and talk about what actually happened there, what the evidence was withheld. But wouldn't the question be like what videos were there that no longer exist? Because it's not what happened in the incident. It's what kind of process he got. So it's all about whether he could have called witnesses if the witnesses did exist, whether he could have used the videos if the videos did exist, but we don't have the videos. It's so amorphous I'm having trouble understanding. Yeah, I think actually what happened is sort of important because it goes to whether the process was a sham. So if the videotape was destroyed and was the best exculpatory evidence, I think right there the answer would be that this does not satisfy Wolf and it does not even meet the minimally stringent standard of Hill. So the way you're going to show the due process violation is to have testimony that basically repeats what the hearing was about who's telling the truth about who hit who first? I think another way to do it would be to take discovery on what happened with the video and also to permit Mr. Mazzoni to identify the witnesses, perhaps with other records that might be available, and he could then establish what was denied him. But I thought your primary argument is regardless of whether he did this or not and whether the process was fair or not, the punishment is unconstitutional in terms of the harm that it does to this individual under these circumstances. Well, that's right in a sense, Your Honor. But what I am saying here is that even if he did this, he had an opportunity conferred by Supreme Court case law to prove that he did not do it. And that is the opportunity. I think we need to clarify this because I actually didn't understand you to be arguing that. So are you are I didn't think you were seeking damages for just 18 months in solitary confinement. I thought the challenge was to what happened in the hearing about whether he should go to solitary confinement. You are correct, Your Honor. I misspoke. Yes. And I see that I am out of time. And if there are no further questions. Thank you both sides for the helpful arguments. The case is submitted.
judges: Wallace, Friedland, Lasnik